**Reversed and Remanded Opinion and Dissenting Opinion filed April 9, 2015.**



In The

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

## NO. 14-13-00456-CV

### EXXONMOBIL CORPORATION, Appellant

### V.

### DELIA PAGAYON, MICHELLE FULTON, ALFREDO G. PAGAYON, MICHAEL G. PAGAYON, AND THE ESTATE OF ALFREDO M. PAGAYON, Appellees

**On Appeal from the Probate Court No. 2**
**Harris County, Texas**
**Trial Court Cause Nos. 408,329-401 & 408,329**

## D I S S E N T I N G   O P I N I O N

I agree with the Majority's determination that for purposes of its response to the Pagayons' motion to strike, ExxonMobil was not required to raise a fact issue regarding whether Dr. Dang, with willful and wanton negligence, violated the standard of care. I disagree, however, with the Majority's conclusion that ExxonMobil raised a fact issue concerning Dr. Dang's alleged negligence in

providing emergency care to Alfredo. Because I would instead conclude that the trial court did not err in striking Dr. Dang's designation, I respectfully dissent.

Though the trial court did not articulate its basis for striking the designation of Dr. Dang in its order, there are two independent reasons that the decision is not error. The trial court would not have erred in concluding that the medical opinion ExxonMobil offered to raise a fact issue on Dr. Dang's alleged departure from the standard of care was not probative opinion testimony in that (1) the "expert" disclaimed knowledge of the applicable standard of care and (2) the physician's "expert opinion" was based upon assumed facts that varied from the actual, underlying facts .

1. *The basis for the "expert opinion" that Dr. Dang fell below the standard of care*

The medical record relied upon by Dr. Casar reflects that Alfredo arrived at the hospital's emergency room via EMS at 17:58.[1] The record also shows injury to the left back and decreased breath sounds on the lower left side. The radiology report also relied upon by Dr. Casar confirms that Dr. Dang immediately ordered a chest x-ray due to chest pain, and the x-ray was performed at 18:08. The radiologist, Dr. Luis DeSantos, read the x-ray at 18:10 and provided a diagnosis of "[c]omplete opacification of the left hemithorax" and commented that the "left hemithorax is completely opaque and there is displacement of the mediastinum toward the right side suggesting the presence of a large amount of fluid in the left hemithorax with displacement of the mediatinum." At 18:46 the emergency room

---

[1] The entirety of Alfredo's medical records were not included as part of the motion-to-strike record. Only a two page "Emergency Provider Record" and the "Diagnostic Radiography" report are provided as the basis for Dr. Casar's opinion.

records show "chest tube insertion because of hemothorax."[2] In fact, Alfredo had no left lung and the x-ray was misread. According to Dr. Casar, Dr. Dang fell below "the standard of care" when, faced with what, in Dr. Casar's opinion was, an unusual x-ray, Dr. Dang failed to wait for a CT scan before deciding to attempt insertion of a chest tube. Dr. Casar stated that "[a]fter the CT Scan was obtained, it became clear that the patient had a congenital absence of the left lung."

*2. The "expert" disclaims knowledge of the standard of care*

Problematic to the above evidence is Dr. Casar's testimony that he is not familiar with the standard protocol for emergency room physicians when they believe they are confronted with a hemothorax and his assumption about the timely availability of diagnostic tools in the emergency room. First, Dr. Casar's field of expertise is critical care medicine, which he concedes has a different standard of care than emergency room medicine. Standing alone, the fact that Dr. Casar's expertise is in a different area is not fatal if Dr. Casar demonstrates knowledge of the area at issue. *See* Tex. R. Evid. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."); *cf. Blan v. Ali*, 7 S.W.3d 741, 745–46 (Tex. App.—Houston [14th Dist.] 1999, no pet.). But Dr. Casar repeatedly testified that he does not know the standard of care for an emergency room physician. Although Dr. Casar testified that, in his opinion, the standard of care for reading an x-ray is the same despite the diagnostic setting, he also stated that he was not familiar with the standard of care for an emergency room physician. When Dr. Casar admitted that he does not know

---

[2] According to Dr. Casar, the thorax is the space between the waist and the neck; a hemothorax is a thorax full of blood, which means that something is bleeding inside, and it is a condition that may be life-threatening if not treated promptly.

the standard for an emergency room physician, he caused his own opinion that the standards are the same to be completely without foundation. In other words, if he does not know what the emergency standard is, he cannot know that the emergency standard is the same as the non-emergency standard.

Where the treatment criticized is provided as part of emergency care, the expert should demonstrate familiarity with that standard of care, not simply guess that the setting for care does not matter. *Cf. Ly v. Austin*, No. 03-05-00516-CV, 2007 WL 2010757, at *5 (Tex. App.—Austin July 13, 2007, no pet.) (mem. op) (holding that when the specific issue before the court is "the standard of care applicable to neurologists providing emergency care immediately following a stroke," testimony from an expert in caring for stroke patients in rehabilitative setting is insufficient). Thus, in my view, Dr. Casar must know the applicable standard of care—in this case, what a reasonably prudent emergency room physician would have done in the same or similar circumstances—to support the designation of Dr. Dang as a responsible third party.

In short, Dr. Casar admitted he has neither the expertise nor the knowledge of reading x-rays or making critical decisions in an emergency room setting. Thus, I would conclude that the trial court did not err in determining that Dr. Casar lacked the requisite knowledge, skill, experience, training, or education to opine on the emergency care provided to Alfredo. *See* Tex. R. Evid. 702; *cf. Ehrlich v. Miles*, 144 S.W.3d 620, 625 (Tex. App.—Fort Worth 2004, pet. denied) ("A medical expert who is not of the same school of medicine, however, is competent to testify if he has practical knowledge of *what is usually and customarily done by a practitioner under circumstances similar to those confronting* the [allegedly negligent physician]." (emphasis added)).

4

The majority urges that, notwithstanding Dr. Casar's admission that he is not familiar with the applicable standard, we may not affirm on this basis because the Pagayon's did not object to Dr. Casar's qualifications. I disagree factually and legally. Counsel for the Pagayons consistently and persistently pointed out Dr. Casar's lack of qualification before the trial court:

> Q. Certainly, an emergency room physician's practice is very different from your practice as a critical care doctor, correct?
>
> . . .
>
> A. It is different, yes.
>
> . . .
>
> Q. You don't practice in the ER, correct?
>
> A. I practice in ICU.
>
> Q. Okay.
>
> A. Not in the ER.
>
> Q. So you don't know what the standard protocol is for emergency room physicians when they believe they have a hemothorax is, do you?
>
> A. I don't know what their standard is.
>
> . . .
>
> Q. But – but for the emergency room. You don't know the emergency room standard – you're – you're basing your understanding of the ICU standard with the ER standard, fair?
>
> A. Fair.
>
> Q. That's not necessarily fair to the doctors is it? Because you agree with me that an ICU setting is different from emergency room setting, fair?
>
> . . .
>
> A. It is different, yes.
>
> Q. And so, sitting here today, you don't know what the standard protocol is for an emergency room physician?

A. I don't – I don't know what the standard of care is for an emergency room physician.

. . .

Q. Again, you're not familiar with the standard of care in the emergency room?

. . .

A. I'm not sure if – what the standard of care for the emergency room, but I would be surprised if it's any different.

Q. But I just want to make sure.

You're not qualified to testify on the standard of care in an emergency room?

. . .

A. I don't know what the standard of care in the emergency room is.

Thus, in my view, the Pagayons placed Dr. Casar's qualification at issue. Here, we are not faced with an alleged error on the admissibility of Dr. Casar's opinion. The trial court did not exclude the evidence. Instead, as the Texas Supreme Court has recently pointed out, the question is whether the expert's opinion is any evidence at all. *Cf. Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 832–33 (Tex. 2014) ("[I]f no basis for the opinion is offered, or the basis offered provides no support, the [expert] opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." (internal quotation and citation omitted)).

Further, the nature of the opinion Dr. Casar proffers is, in the words of our opinion in *Blan v. Ali*, "peculiar to the field" of emergency medicine about which he knows nothing. 7 S.W.3d 741, 746 (Tex. App.—Houston [14th Dist.] 1999, no pet.). As noted above, Alfredo was admitted to the emergency room at 5:58 p.m. Dr. Dang testified that he "was very concerned about [Alfredo]'s medical condition and believed that if [he] did not take immediate medical action,

6

[Alfredo]'s health could have been placed in serious jeopardy." Dr. Dang performed a physical examination and obtained a chest x-ray at approximately 6:08 p.m., which, as noted above, revealed complete opacification of the left hemithorax. Dr. Dang's interpretation of the chest x-ray was confirmed by Dr. DeSantos. Further, as Dr. Dang testified,

> Based on, among other things, the x-ray, Mr. Pagayon's medical condition, and *his need for emergency care*, I made the decision to place a chest tube to drain what I believed to be a hemothorax in his left lung. . . . *Based on the circumstances and the emergency situation*, I made the determination that there was not time to perform a CAT scan prior to placing the chest tube. In my training and experience when dealing with what one believes to be a hemothorax, the same must be addressed as soon as possible.

(emphasis added). Thus, according to Dr. Dang—and acknowledged by Dr. Casar—Dr. Dang was providing emergency medical care when he attempted the chest tube insertion. Dr. Casar's admission that he does not know the standard of care for emergency room physicians is "determinative." *See id.*

### 3. The "expert opinion" rests on misperceived facts

Second, Dr. Casar repeatedly displayed his unfamiliarity with the facts of Alfredo's care in his deposition testimony. *Cf. Houston Unlimited, Inc. Metal Processing*, 443 S.W.3d at 822 ("If an expert's opinion is unreliable because it is 'based on assumed facts that vary from the actual facts,' the opinion 'is not probative evidence.'" (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499–500 (Tex. 1995)). If the factual assertions or assumptions underlying an expert's opinion are contrary to the facts, opinion testimony founded on those

7

assumptions is not competent evidence.  *Cf. id.* at 833.  Here, Dr. Casar's opinion was based on assumptions contrary to proven facts in several respects.[3]

For example, Dr. Casar was mistaken about the time and dosages of morphine provided to Alfredo:  Dr. Casar initially stated that the morphine was still in Alfredo's system when he was intubated, but when confronted with Alfredo's medical records that established the contrary, Dr. Casar acknowledged that morphine was "probably not" still in Alfredo's system when he was later intubated in the ICU.  Dr. Casar also testified that Alfredo's respiratory rate was 32 breaths per minute, an elevated rate, when he was admitted to the ICU.  But when confronted with Alfredo's records, Dr. Casar stated that the record showed Alfredo's breath rate was 24 breaths per minute.  Further, he testified that there was a note in Alfredo's medical records that Afredo could be released that "afternoon" from the emergency room.[4]  Yet, the doctor was unable to find this note when given an opportunity to search through the records.  Finally, Dr. Casar's criticism of Dr. Dang's failure to wait for a CT scan to confirm his hemothorax diagnosis emanated from his belief that "in the emergency room, you can get a CAT scan in 15 minutes." But the following exchange occurred during Dr. Casar's deposition:

---

[3] The "facts" as proven at the time of the motion to strike did not include Alfredo's entire medical records.  Instead, these "facts" included Dr. Casar's deposition testimony and a few pages from Alfredo's records.  Thus, although the Majority notes several facts from Alfredo's medical records in its harm analysis, those facts were not part of the record when the trial court implicitly determined that Dr. Casar's opinion testimony failed to raise a fact issue regarding Dr. Dang's purported responsibility.  In other words, the Majority has reviewed the trial court's alleged error based upon a record that was not before the trial court at the time it made the challenged ruling.  Moreover, the facts the Majority draws from the expanded record are facts neither articulated, nor apparently known, by Dr. Casar at the time he supplied the deposition testimony ExxonMobil presented to the trial court.

[4] As noted above, Alfredo was admitted to the emergency room at 17:58, which is 5:58 p.m.  Thus, it does not appear that Alfredo was in the emergency room in the "afternoon."

8

Q. You also testified he had a CT scan less than an hour after . . . after the chest tube.

Remember that?

A. Yes.

Q. That's not the case, is it, Doctor?

A. I said I don't remember exactly the time line.

Q. In fact, let me show you what's . . . previously been marked as Exhibit No. 37.

A. Okay.

Q. And he didn't have a CT scan until 8:53 that night, more than two hours —

A. Two hours.  Well, that's terrible.

Q. More than two hours, correct?

A. That's terrible.

Q. And more than three hours after his initial . . . consult, right?

A. Yeah. So, you see — uh-huh.

Q. You can't wait three hours for a CAT scan, can you doc?

A. Well, they waited and nothing happened.

Q. If you can get a CAT scan at the snap of a finger, as you claim you can —

A. Yeah.  You should be able to here.

Q. Took two hours here?

A. Right.

Q. And they ordered one immediately, and it took two hours?

A. That's not good.  That's not good.  That's not what it [sic] should happen in an emergency room.

***

Q. Would you like to correct your testimony wherein you stated he received a CAT scan 30 minutes after his chest tube?

A. Yes.

9

In summary, Dr. Casar did not indicate that he was familiar with the facts of Alfredo's care. Instead, the record before the trial court indicates that he based his conclusions on either improper recollections of the facts or assumptions. *See id.*; c*f. Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010) (holding that the basis for an expert's opinion must be linked to the facts).

*4. Conclusion*

I would conclude, after considering Dr. Casar's testimony as a whole, that Dr. Casar's opinions do not raise a fact question regarding whether Dr. Dang failed to act as a reasonably prudent physician under the same or similar circumstances. Although Exxon Mobil offered Dr. Casar's opinion on emergency room treatment in an emergency situation, Dr. Casar did not undertake to analyze Dr. Dang's conduct in the context of the circumstances of emergency care. As such, Dr. Casar's statements that he does not know the emergency room standard of care is determinative. *Cf. Ehrlich*, 144 S.W.3d at 625; *Blan*, 7 S.W.3d at 746 (noting that expert's admission that he was unfamiliar with the emergency room and cardiology standards of care would be "persuasive, if not determinative *if* [he] were purporting to offer expert medical opinions in matters peculiar to the fields of cardiology or emergency medicine"). Dr. Casar's testimony completely misses the mark regarding whether Dr. Dang's care of Alfredo fell below the standard of care for a reasonably prudent physician in an emergency room setting. Indeed, Dr. Casar's testimony demonstrated he was unfamiliar with the actual facts surrounding Alfredo's medical care. *Cf. Houston Unlimited, Inc. Metal Processing*, 443 S.W.3d at 832–33; *Jelinek*, 328 S.W.3d at 539. Thus, I would conclude that Dr. Casar's opinion is no evidence of Dr. Dang's responsibility for Alfredo's death.

In sum, I agree with the Majority that ExxonMobil did not need to bring forth evidence that Dr. Dang willfully and wantonly departed from the standard of

care. But ExxonMobil nonetheless needed to bring forth some probative evidence that Dr. Dang departed from the applicable standard of care. Because ExxonMobil failed to do so, I would conclude that the trial court did not err in striking the designation of Dr. Dang. Because the Majority concludes otherwise, I respectfully dissent.


/s/      Sharon McCally
         Justice

Panel consists of Justices Christopher, McCally, and Wise (Christopher, J., majority).