ACCEPTED
06-14-00003-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
1/29/2015 6:40:03 PM
DEBBIE AUTREY
CLERK

No. 06-14-00003-CV

# In the
# Sixth Court of Appeals
# Texarkana, Texas

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
1/29/2015 6:40:03 PM
DEBBIE AUTREY
Clerk

PETROHAWK PROPERTIES, L.P.
AND P-H ENERGY, L.L.C.,
*Appellants,*

v.

NOEL DIANE JONES, ET AL.,
*Appellees.*

On Appeal from the 71st District Court,
Harrison County, Texas (Cause No. 11-0849)

## MOTION FOR REHEARING

Reagan W. Simpson
 State Bar No. 18404700
Marc S. Tabolsky
 State Bar No. 24037576
YETTER COLEMAN LLP
909 Fannin Street, Suite 3600
Houston, Texas 77010
Tel. (713) 632-8000
Fax (713) 632-8002
(additional counsel listed on inside cover)

**Counsel for Appellants**

Harry L. "Gil" Gillam, Jr.
State Bar No. 07921800
GILLAM & SMITH L.L.P.
303 S. Washington Avenue
Marshall, Texas 75670-4157
Tel. (903) 934-8450
Fax (903) 934-9257

Guy S. Lipe
State Bar No. 12394600
Jason M. Powers
State Bar No. 24007867
Stacy M. Neal
State Bar No. 24060322
Nicholas N. Shum
State Bar No. 24075072
VINSON & ELKINS L.L.P.
1001 Fannin St., Suite 2500
Houston, Texas 77002
Tel. (713) 758-2522
Fax (713) 615-5809

# TABLE OF CONTENTS

PAGE

Index of Authorities................................................................4

Argument ...............................................................................6

I.    The Court's Interpretation of Defensible Title Is Incorrect. ...........8

II.   The Court's Discussion of Horne's Opinion and the Purported Damages Evidence Relies on Factual Inaccuracies. ......................................................................18

Conclusion and Prayer .........................................................24

Certificate of Compliance Under Appellate Rule 9.4.............26

Certificate of Service ...........................................................27

# INDEX OF AUTHORITIES

**PAGE(S)**

*Americo Life, Inc. v. Myer,*
   440 S.W.3d 18 (Tex. 2014) ...................................................... 14, 15, 16

*Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.,*
   352 S.W.3d 445 (Tex. 2011) .................................................... 14, 15, 16

*Apex Fin. Corp. v. Brown,*
   7 S.W.3d 820 (Tex. App.—Texarkana 1999, no pet.) .......................... 10

*Balandran v. Safeco Ins. Co. of Am.,*
   972 S.W.2d 738 (Tex. 1998) ................................................................ 12

*Birmingham Fire Ins. Co. of Pa. v. Am. Nat'l Fire Ins. Co.,*
   947 S.W.2d 592 (Tex. App.—Texarkana 1997, writ denied) .............. 13

*Forbau v. Aetna Life Ins. Co.,*
   876 S.W.2d 132 (Tex. 1994) ................................................................ 10

*Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.,*
   352 S.W.3d 462 (Tex. 2011) ................................................................ 14

*Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch,*
   443 S.W.3d 820 (Tex. 2014) ......................................................... 18, 24

*Lewis v. E. Tex. Fin. Co.,*
   136 Tex. 149, 146 S.W.2d 977 (1941) ................................................. 13

*Petrohawk Properties, L.P. v. Jones,*
   — S.W.3d —, 2015 WL 170225 (Tex. App.—Texarkana
   Jan. 14, 2015, no pet. h.) ...................................................................... 6

*Sun Oil Co. (Delaware) v. Madeley,*
   626 S.W.2d 726 (Tex. 1981) ............................................................... 13

**Rules**

Tex. R. App. P. 9.4 .................................................................................. 26

Tex. R. App. P. 9.5 .................................................................................. 27

Appellants Petrohawk Properties, L.P. and P-H Energy, L.L.C. (collectively "Petrohawk") respectfully submit this motion for rehearing in response to the opinion issued by the Court on January 14, 2015. *Petrohawk Properties, L.P. v. Jones*, — S.W.3d —, 2015 WL 170225 (Tex. App.—Texarkana Jan. 14, 2015, no pet. h.). Petrohawk requests that the Court consider the following:

### ARGUMENT

While Petrohawk respectfully disagrees with the Court's resolution of many of the issues addressed in the Court's opinion, Petrohawk does not seek in this motion to reurge every argument that this Court has already rejected. That said, Petrohawk does seek rehearing on two points where the Court either relied on grounds that were not raised by any of the parties or where, Petrohawk respectfully submits, the Court's opinion appears to be based on factual inaccuracies.

First, Petrohawk moves for rehearing on the Court's conclusion that the district court properly instructed the jury that under the July 2008 agreement, Petrohawk was obligated to lease minerals for tracts

6

where the Lessors did not own 100% of the gross mineral interest in the Haynesville Shale. *See* Opinion, Section II.B.3.c, pp. 34-38.

In rejecting Petrohawk's argument that the district court improperly instructed the jury that Lessor's did not have to own 100% of the Haynesville Shale mineral interest in a tract before Petrohawk was required to pay a lease bonus, the Court adopted an interpretation of the contract that was not raised by any party in the district court or this Court. *Compare* Op. at 37 *with* Appellants' Br. 41-43; Appellees' Br. 22-26; 2 CR 270-76. Because the Court's opinion relies on a rationale not previously raised by the district court or any of the parties, Petrohawk responds to the Court's interpretation of the July 2008 agreement. Petrohawk respectfully submits that the Court's interpretation of the agreement's definition of Defensible Title is both incorrect based on the text of the July 2008 agreement itself and also improperly relies on extrinsic evidence of the parties' subjective intent.

Second, Petrohawk respectfully submits that the Court's conclusion that there was "more than a scintilla of evidence that supports the jury's implied finding of no market value, the evidence is legally sufficient to support the award of damages" is incorrect and is

based on certain factual inaccuracies. *See* Opinion, Section II.B.5, pp. 41-44.

## I. The Court's Interpretation of Defensible Title Is Incorrect.

Whether the district court properly instructed the jury that the "language in paragraph 3(iii) reading: 'the title to the properties comprising the Subject Interests includes all rights in the Haynesville Shale and rights owned by Lessors in the Bossier Shale' does not require the Lessors to own 100% of the gross Haynesville Shale mineral acreage on the tract" turns on whether the district court correctly interpreted paragraph 3(iii). The parties do not dispute that Petrohawk only had to pay lease bonuses on properties on which the Lessors had Defensible Title as defined paragraph 3(i-iii). Appellees' Br. 22; Appellants' Reply Br. 20.

Where the parties and the Court differ is how to interpret paragraph 3(iii). Petrohawk argued that Paragraph 3(iii)'s plain text, properly interpreted, provided that Defensible Title existed only if the Lessors had to own 100% of the gross mineral interest in the Haynesville Shale. The text compels this interpretation because the agreement provides that Defensible Title required Lessors to own "*all*

8

*rights* in the Haynesville Shale" but only "*rights owned by Lessors* in the Bossier Shale" for Lessors to have Defensible Title. Plaintiffs, however, argued that the Court should simply add by implication the word "Lessors'" between "all" and "rights."

But this Court disagreed with all of the parties. Instead, this Court held that to avoid rendering any language superfluous, it had to harmonize the broad statements in the first unnumbered paragraph indicating (according to the Court) that the agreement covered "all of the Family's unleased mineral interests in the subject area as long as those interests included, at a minimum, the Haynesville Shale (its primary focus), and those depths of the Bossier Shale that were unleased and not held by production (its secondary focus)," Op. at 37, with the requirement in the definition of Defensible Title that Lessors convey "all rights in the Haynesville Shale and rights owned by Lessors in the Bossier Shale." *Id*. The Court accomplished this result by essentially rewriting the definition of Defensible Title.

Under the Court's interpretation, "all rights in the Haynesville Shale and rights owned by Lessors in the Bossier Shale" should be interpreted to mean "the rights to *all depths* in the Haynesville Shale

9

and the rights to *all depths currently unleased or currently not producing owned* by the Lessors in the Bossier Shale." *Id.* (emphasis in original).

The Court's interpretive approach is flawed because of two errors. First, it improperly lets general provisions control over specific provisions and thus rewrites the agreement under the guise of interpretation. Second, the Court's examination of "surrounding circumstances" as part of interpreting the July 2008 agreement goes well beyond the limited purposes for which Texas law permits examination of surrounding circumstances.

The Court's interpretive approach does not properly take into account the controlling legal principle that specific contractual provisions control over general provisions. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133-34 (Tex. 1994); *Apex Fin. Corp. v. Brown*, 7 S.W.3d 820, 826 (Tex. App.—Texarkana 1999, no pet.). The rule that specific provisions control over general provisions is particularly strong in this case where the text of the July 2008 agreement itself indicates that the specific provisions of paragraph 3 are intended to control over the general provisions of the first paragraph.

While the Court focuses extensively on not rendering superfluous the unnumbered first paragraph's general statements about what mineral interests are covered by the agreement, it does not take into account the July 2008 agreement's plain text indicating that the parties intended for the specific provisions of paragraph 3, which contains the Defensible Title limitation, to control over the general provisions of the first unnumbered paragraph.

The parties' expressed intent for paragraph 3 to control is found in the last sentence of the paragraph, which states that the leases "shall include all depths, *subject to the lease provisions contemplated in paragraph 3 herein,* as to those properties within the Subject Interests that are currently unleased or not currently producing." PX1 at 1 (emphasis added).

In other words, the very sentence in the first paragraph that has the language the Court relies on to rewrite paragraph 3(iii) expressly states that Petrohawk's leasing obligations are controlled by the specific provisions of paragraph 3.

Thus, not only does the Court's interpretation of Defensible Title not conform to the contract-interpretation principle that specific

11

provisions control over general provisions, but it also results in precisely the outcome the Court was trying to avoid. That is, the Court's interpretation renders the "subject to the lease provisions contemplated in paragraph 3" superfluous. The Court did not need to read the general provisions of the first paragraph into Defensible Title to preserve the meaning of all provisions. Rather, all of the agreement's provisions are given meaning by respecting the parties' expressed intent that the obligation to lease and pay bonus was to be governed and restricted by the specific provisions of paragraph 3.

The second flaw in the Court's approach is that it appears to have improperly considered extrinsic evidence of Petrohawk's subjective intent as part of the Court's examination of circumstances surrounding the execution of the contract. Courts may not look to "surrounding circumstances" to interpret contracts. Rather, courts may examine such evidence only for the limited purpose of determining whether an ambiguity exists.

- "While parol evidence of the parties' intent is not admissible to create an ambiguity, the contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists." *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998) (internal citation omitted).

12

- "It follows that parol evidence is not admissible to render a contract ambiguous, which on its face, is capable of being given a definite certain legal meaning. This rule obtains even to the extent of prohibiting proof of circumstances surrounding the transaction when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties, or is so worded that it is not fairly susceptible of more than one legal meaning or construction." *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981) (quoting *Lewis v. E. Tex. Fin. Co.*, 136 Tex. 149, 146 S.W.2d 977, 980 (1941)).

- "Birmingham's argument is an attempt to circumvent the parol evidence rule by importing an examination of 'surrounding circumstances' into standard contract interpretation. However, an examination of precedent reveals that 'surrounding circumstances' are only examined to determine whether a contract is latently ambiguous." *Birmingham Fire Ins. Co. of Pa. v. Am. Nat'l Fire Ins. Co.*, 947 S.W.2d 592, 602 (Tex. App.—Texarkana 1997, writ denied).

Petrohawk believes the above-cited cases from the Texas Supreme Court and this Court properly state the rule limiting the use of "surrounding circumstances" evidence in contract interpretation. Thus, under these cases, the Court's reliance on evidence of surrounding circumstances in interpreting the provisions of Paragraph 3(iii) for a purposes beyond determining whether the contract is ambiguous (such as the broader purpose of interpreting the contract) is incorrect and erroneous.

13

It is true that in other cases, the Texas Supreme Court has perhaps implicitly suggested that "surrounding circumstances" evidence can play a broader role beyond the limited inquiry as to whether a contract is ambiguous. *See, e.g.*, *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014) ("A written contract must be construed to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the limitations of the parol-evidence rule.") (citing *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011)); *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011) ("Understanding the context in which an agreement was made is essential in determining the parties' intent as expressed in the agreement, but it is the parties' expressed intent that the court must determine. Extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated."). Petrohawk respectfully submits that *Balandran* and *Birmingham Fire Insurance Company* state the correct rule.

But even when the Texas Supreme Court has not expressly limited the role of "surrounding circumstances" evidence as it did in *Balandran*, the Court has limited what constitutes evidence of surrounding circumstances: "Facts and circumstances that may be considered include the commercial or other setting in which the contract was negotiated and other *objectively determinable factors* that give context to the parties' transaction." *Myer*, 440 S.W.3d at 22 (emphasis added). Similarly, *Anglo-Dutch* states that extrinsic evidence "cannot be used to show the parties' motives or intentions apart from the [agreement]; it can only provide the context in which the agreement was reached." 352 S.W.3d at 452.

In this case, the Court's examination of surrounding circumstances went too far. On pages 35 and 36, the Court undertakes an extensive discussion of the parties' respective knowledge of oil and gas leasing, oil and gas production in Harrison County, the different geological formations that were at issue, the presence of vertical Pugh clauses in certain prior leases, and existing leasing and production of certain shallower depths. Op. at 36.

But at the end of this discussion, the Court went beyond what *Myer* and *Anglo-Dutch* may allow. The Court went beyond evidence of the "setting in which the contract was negotiated" and the "objectively determinable factors." *Myer*, 440 S.W.3d at 22. Instead, the Court went on to address Petrohawk's subjective intentions when it entered into the agreement. The Court did this when it stated that "While Petrohawk was primarily focused on leasing Haynesville Shale mineral interests, it was secondarily interested in the Bossier Shale." Op. at 36. At this point, however, the Court's analysis crossed the line from looking at what might be considered evidence of surrounding circumstances into what *Anglo-Dutch* expressly prohibits—evidence of Petrohawk's purported "motives or intentions." *Anglo-Dutch*, 352 S.W.3d at 452.

Moreover, it appears that the Court's reference to what it perceives as Petrohawk's subjective intention is not a passing reference but in fact was an integral part of how it construed the text of the July 2008 agreement. Immediately after describing Petrohawk's primary and secondary focus, the Court relies on this view of Petrohawk's subjective intent in its contract analysis. Op. at 37 ("Looking back at the Agreement with this in mind, we see in the first paragraph that the

16

parties intended that Petrohawk would lease all of the Family's unleased mineral interests in the subject area as long as those interests included, at a minimum, the Haynesville Shale (its primary focus), and those depths of the Bossier Shale that were unleased and not held by production (its secondary focus)."

Thus, not only did the Court incorrectly rewrite the definition of Defensible Title when it effectively incorporated text from other parts of the agreement into paragraph 3(iii) and changed the phrase "all rights" to be "the rights," its analysis also incorrectly relied on extrinsic evidence of Petrohawk's subjective intent when it interpreted the July 2008 agreement.

For these reasons, and those set forth in Petrohawk's briefs, Petrohawk respectfully suggests that the Court incorrectly interpreted the July 2008 agreement and that, in light of the correct interpretation of the agreement, the district court's instruction cannot stand. Thus, for all of these reasons, Petrohawk requests that the Court reverse the district court's judgment and render judgment that Petrohawk is not liable for failing to lease tracts 2-6, 9-13, 16-26, 28-30, and 33 in which it is undisputed Lessors did not own all of the Haynesville Shale

17

interests. Alternatively, the erroneous instruction requires a new trial on all issues.

## II. The Court's Discussion of Horne's Opinion and the Purported Damages Evidence Relies on Factual Inaccuracies.

The Texas Supreme Court has explained that when an expert's opinions rely "on insufficient data and unsupported assumptions," it is conclusory and without evidentiary value. *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 838 (Tex. 2014). Similarly, "if the record contains no evidence supporting an expert's material factual assumptions, or if such assumptions are contrary to conclusively proven facts, opinion testimony founded on those assumptions is not competent evidence." *Id*. at 833.

Here, the Court held that there was more than a scintilla of evidence to support the jury's implied finding of no market value. Op. at 43-44. The Court reached this conclusion based on its finding that while the evidence was conflicting, "it would support Horne's testimony that there was no market value for the leases." *Id*. at 43.

Petrohawk respectfully submits that the Court's conclusion that there was conflicting evidence supporting Horne's testimony is based in

a misapprehension of what Horne actually testified at trial. The Court's opinion states that

> [Horne] testified that the lack of capital for such ventures brought about a situation wherein the only new leasing of oil and gas minerals was due to commitments made by the lessees before the crash of the financial markets or due to unit leasing. He further testified that oil and gas minerals in the ground only have a lease value if there is a market for leasing them. He opined that, since in October 2008 there was no market for them, Appellees' leasehold estate in the minerals had no market value.

Op. at 41-42.

But Horne did not say that the "only new leasing of oil and gas minerals was due to commitments made by the lessees before the crash of the financial markets or due to unit leasing." *Id.* While this is certainly how Plaintiffs characterized Horne's testimony, Appellees' Br. 45, that is not what Horne testified. At trial, Horne admitted that although he said leasing in Harrison County had come to a "screeching halt," he readily acknowledged "[c]ertainly there were some leases being acquired." 7 RR 141.

Moreover, Horne acknowledged that the leasing that was occurring in Harrison County in October 2008 could have been for

reasons other than remnant leasing or pre-existing contractual commitments.

> Q. You know there were some leases being signed on Harrison County acreage in October, don't you?
>
> A. *I suspect there were. They could have been either entered into previously or they could have been leases to complete a unit or for some other reason*, but the land rush that existed here prior to, and really in all the shale plays, really ceased due to the economic conditions due to the market conditions in October of 2008.

7 RR 136 (emphasis added).

Thus, while Horne certainly opined that the mineral leasing market in Harrison County in October 2008 had slowed considerably, he never testified that new leases were not being signed in October 2008 nor did he testify that any such new leases were limited to prior commitments or unit leasing. Rather, Horne himself admitted that new leases could have been entered into for other reasons as well. Thus, Horne did not testify leasing had stopped in Harrison County in October 2008 nor did he testify that there was no market for leases in October 2008.

Nor did Horne testify that minerals only have a lease value if there is a market for them. His opinion was narrower than that. Horne

20

opined that "There is no value to minerals in the ground unless somebody is not [*sic*] knocking on your door or giving you a phone call offering to pay you something for them." 7 RR 133.

But Horne never said that there was no one contacting the Plaintiffs in October 2008 and there is no evidence in the record from which a reasonable juror could infer that the Plaintiffs were not receiving any phone calls or inquiries to lease their minerals.

First, the Court states that although Ellen Miller and Lelia Vaughan sent emails to their family members on October 24 and 27, 2008 discussing various inquiries and requests for leases they had received, the emails did not make clear when the inquiries and requests were made. *See* Op. at 43; DX275, DX278. Even under the Court's reading of the emails, however, they do not provide any evidence that no offers or inquiries were made in October 2008.[1] But Horne's opinion can support the jury's zero-market-value finding only if there is evidence in the record that Plaintiffs did not receive any inquiries or requests to lease in October 2008.

_____

[1] While Lelia Vaughan's October 27, 2008 email does not expressly state when EXCO requested a lease from the family, her email makes clear that she believed EXCO's offer was still on the table, because she stated "[w]e do not need to entertain EXCO's request for a lease at this time." *See* DX278.

21

Second, the Court's opinion does not address DX264, an October 9, 2008 email from Ned Hartline, attorney for several of the Plaintiffs, to Petrohawk's Herod stating that "What can I tell my people? ***We are still getting calls from other interested potential lessees***. What are your intentions?" DX264. Unlike the other emails the Court discussed, Mr. Hartline's email makes clear that as of October 9, Plaintiffs were still getting calls "from other interested potential lessees." DX264. And nowhere in the record is there conflicting evidence suggesting that Plaintiffs were not receiving these calls or that Mr. Hartline's statement to Herod was incorrect.

Third, the Court's opinion states that "Fort Staggers, vice president of the bank that was trustee of one of the Appellee interests, testified that there had been no interest in leasing all of the tracts from October 2008 until trial." Op. at 43. But this is not what Mr. Staggers testified. He never said that there was "no interest" in leasing the tracts from October 2008 until trial. Rather, Mr. Staggers said he did not "receive any viable offers for the unleased acreage on these 32 tracts that's in 162A after October of 2008." 7 RR 173. This testimony, however, does not address what occurred in October 2008.

Nor does it state that no offers were received to lease the tracts. Rather, Staggers simply agreed that there were no "viable offers." But for there to be no market value at all, under Horne's purported opinion, there had to be no offers regardless of whether the mineral owners considered them viable.

Staggers further answered "no" when asked "is there any interest shown in buying all the acreage from October 28th -- all the acreage that's listed in 162A from October of 2008 through today?" 7 RR 173. But whether someone is interested in buying the minerals is a fundamentally different question than whether someone was in interested in obtaining a mineral lease. Just because there may not have been someone willing to buy Plaintiffs' minerals does not mean that there was no interest in leasing the minerals. Obtaining a mineral lease and purchasing a mineral estate are two fundamentally different transactions.

In short, there is no record evidence to support the key assumption of Horne's opinion as to when minerals have no lease value—that no one was calling Plaintiffs in October 2008 to lease their minerals. Hartline's email unequivocally indicates that there were still

23

actively interested lessees in October 2008 and there is no conflicting evidence which suggests that there were no such inquiries. Because Plaintiffs failed to offer any evidence from which a reasonable juror could infer that Plaintiffs were not receiving any inquiries or offers to lease their minerals in October 2008, there was legally insufficient evidence to support the jury's damages findings in Question 11. *Mel Acres Ranch*, 443 S.W.3d at 838.

For these reasons, and those set forth in Petrohawk's briefs, Petrohawk requests that the Court reverse the district court's judgment and render a take-nothing judgment in light of the legally insufficient evidence to support the jury's answer to Question 11.

## CONCLUSION AND PRAYER

For these reasons, the Petrohawk appellants respectfully request that the Court grant this motion for rehearing and all other relief to which they may be entitled.

Respectfully submitted,

/s/Reagan W. Simpson

Guy S. Lipe
State Bar No. 12394600
Jason M. Powers
State Bar No. 24007867
Stacy M. Neal
State Bar No. 24060322
Nicholas N. Shum
State Bar No. 24075072
VINSON & ELKINS L.L.P.
1001 Fannin St., Suite 2500
Houston, Texas 77002
Tel. (713) 758-2522
Fax (713) 615-5809

Reagan W. Simpson
State Bar No. 18404700
rsimpson@yettercoleman.com
Marc S. Tabolsky
State Bar No. 24037576
mtabolsky@yettercoleman.com
YETTER COLEMAN LLP
909 Fannin Street, Suite 3600
Houston, Texas 77010
Tel. (713) 632-8000
Fax (713) 632-8002


Harry L. "Gil" Gillam, Jr.
State Bar No. 07921800
GILLAM & SMITH L.L.P.
303 S. Washington Avenue
Marshall, Texas 75670-4157
Tel. (903) 934-8450
Fax (903) 934-9257

**COUNSEL FOR APPELLANTS**

## CERTIFICATE OF COMPLIANCE UNDER APPELLATE RULE 9.4

I certify that this document complies with the type-volume limitation of Texas Rule of Appellate Procedure 9.4(i)(2) because it contains 3,699 words, excluding the parts of the document exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

/s/Marc S. Tabolsky
Marc S. Tabolsky

CERTIFICATE OF SERVICE

Pursuant to TEX. R. APP. P. 9.5(e), I hereby certify that a true and correct copy of this document has been served on lead counsel for appellees by electronic means on January 29, 2015, as follows:

Kevin Dubose
ALEXANDER DUBOSE JEFFERSON TOWNSEND
1844 Harvard Street
Houston, Texas 77008-4342
kdubose@adtappellate.com

Dean A. Searle
SEARLE & SEARLE PC
P.O. Box 910
Marshall, Texas 75670

Mark C. Harwell
W. Mark Cotham
COTHAM, HARWELL & O'CONOR
1616 S. Voss, Suite 200
Houston, Texas 77057
mharwell@chetexas.com
mcotham@chetexas.com

John Mercy
MERCY CARTER & TIDWELL, LLP
1724 Galleria Oaks Drive
Texarkana, Texas 75503

/s/Marc S. Tabolsky
Marc S. Tabolsky