**Opinion issued December 15, 2020**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-19-00997-CV

—————————————

**JENNIFER BARK, Appellant**

**V.**

**JASON KEEN, Appellee**

---

**On Appeal from the County Civil Court at Law No. 3**
**Harris County, Texas**
**Trial Court Case No. 1122453**

---

## MEMORANDUM OPINION

Appellant, Jennifer Bark, challenges the trial court's rendition of summary judgment in favor of appellee, Jason Keen, in Keen's negligence suit against her for property damage arising from an auto collision. In her sole issue, Bark argues that

the trial court erred in granting summary judgment because Keen did not conclusively establish his claim for damages based on a diminution in the market value of his repaired car.

We reverse and remand.

## Background

In his petition, Keen alleged, that, on April 24, 2018, while he was driving his Chevrolet Corvette Stingray on Farm-to-Market Road 1960 in Harris County, Bark, who was driving behind him, failed to stop and drove her car into the back of the Corvette. Bark stipulated to liability and paid the cost of repairs, which totaled $9,557.05. Keen alleged that, despite the repairs, the market value of the Corvette was diminished by $11,411.10 based on the car having collision and repair history. After Bark failed or refused to reimburse him for the asserted diminished value, Keen brought a negligence claim against her, seeking $11,411.10 in damages.

Keen moved for a summary judgment on his claim, asserting that he was entitled to judgment as a matter of law because liability was undisputed and his evidence established that Bark's negligence diminished the market value of the Corvette as alleged. Keen attached to his motion a copy of his purchase contract, reflecting that, on November 13, 2017, he purchased the 2014 Corvette, with an odometer reading of 18,595, from Corvettes of Houston, Inc., for $53,669.06. Keen also attached his own affidavit, in which he testified that, at the time of purchase, the

2

car had no prior damage. However, four months after purchase, in an unrelated matter on March 26, 2018, a motorist drove into the back of the Corvette ("previous collision"). The motorist stipulated to liability and paid the cost of repairs, which totaled $4,723.35. The Corvette was repaired at a Chevrolet dealership. On April 24, 2018, shortly after Keen drove away from the dealership in the repaired Corvette and was stopped at a traffic light, Bark drove her car into the back of the Corvette ("instant collision"). And, the Corvette was again repaired.

Keen retained an expert, Justin Petty, to appraise the diminished market value of the repaired Corvette attributable to each of the collisions. Petty determined that the previous collision diminished its market value by $6,713.00, and Keen settled his claim with the motorist. With respect to the diminution-in-value attributable to the instant collision, Keen attached Petty's affidavit and supporting expert report.

In his affidavit, Petty testified that he has been an automobile appraiser for 22 years and follows the industry's Uniform Standards of Professional Appraisal Practice ("USPAP"). He has appraised 15,000 vehicles and has performed 4,000 value assessments focusing on "inherent diminished trade-in value." He has testified as an expert witness on 30 occasions, has authored various books and articles, and has presented seminars on the marketability of vehicles damaged in collisions.

Petty stated in his affidavit that his objective is to determine the "inherent diminished value" of the subject vehicle, which he defined as:

3

the difference in selling price, in a specific market, of a damaged vehicle that has been repaired and restored to industry standard as compared to a similar vehicle that has never been damaged. This Inherent Diminished Value is the result of a prospective buyer's perception that a vehicle with an accident history is not as valuable as another vehicle of the same year, make, model, condition and mileage, which has never been damaged.

With respect to his methodology, Petty stated:

9. In calculating diminished value I determine the vehicle's pre-crash market value. I then determine the vehicle's post-repair market value. The diminished value is the amount by which the vehicle's pre-crash market value exceeds its post-repair market value. A number of factors affect a vehicle's Loss of Market Value after sustaining a collision and undergoing subsequent repairs. These include, but are not limited to: market demand for the vehicle (its year, make, model, mileage and condition); the amount, type and severity of damage; the specific area(s) of damage to the vehicle; the quality of the repairs and replacement parts; adjuster and body shop oversight; and consumer beliefs, i.e., that vehicles that have been involved in an accident are more likely to present future problems, with associated costs, because of the structural, mechanical, electrical, safety or cosmetic repairs that had to be made. It is well-known that the vast majority of collision repair facilities cannot duplicate manufacturer tolerances or quality.

. . . .

11. In determining diminished value I review the repair facility's estimate of record. . . . After determining that a vehicle owner's chosen repair facility has properly identified the damages to the car, and properly performed the repairs in accordance with ASE (Automotive Service Excellence) or I-CAR collision repair industry standards, I make numerous calculations to arrive at the pre-loss (before crash) market value of the damaged vehicle. I weight the repairs proportionally with respect to the degree by which they would affect the vehicle's integrity, function, safety, appearance, value and warranty.

12. I also review and take into account any prior accident records. From these records I determine any prior diminished value. The market

4

value of the vehicle immediately prior to the accident in question is reduced by the amount of diminished value attributable to any prior accidents. . . .

Petty noted that he does not physically inspect the subject vehicle. Rather, he reviews photographs and discusses the condition of the vehicle with the owner. He develops his data by conducting phone interviews, field research, peer consultations, and market surveys. He also utilizes data from published guides, such as the National Automobile Dealers Association ("NADA") Guide.

With respect to the instant case, Petty testified that he was retained to evaluate whether the market value of Keen's 2014 Chevrolet Corvette Stingray Z51 convertible was diminished following the April 24, 2018 collision with Bark, which caused damage requiring $9,557.05 in repairs. He noted that he did not inspect Keen's Corvette before or after the repairs attributable to the previous or instant collisions. Rather, he reviewed photographs of Keen's car and repair "estimate[s]," which he attached, and he discussed the condition of the car with Keen.

With respect to applying his methodology in this case, Petty testified:

18. In this case, Mr. Keen's vehicle had been involved in a prior accident on March 26, 2018. . . . I calculated the diminished value resulting from the first accident to be $6,713.00. I then determined what the market value of the Corvette would have been just prior to the second accident had it not been in a prior accident. That number was $44,750.00. I then subtracted from that number the $6,713.00 in diminished value resulting from the first accident to arrive at a pre-crash starting value of $38,037.00 for purposes of determining the diminished value resulting from the second accident. In that manner, I accounted for the diminished value resulting from the first accident.

5

. . . .

20.     After determining that the Corvette's market value just prior to the second accident was $38,037.00 . . . , I proceeded to calculate the diminished value resulting from the second accident. For this appraisal, the relevant market is the dealer trade-in market. Research shows that more than 60% of privately owned vehicles are sold to a retail dealer as trade-ins from private owners. However, as my research, experience and data indicate, a collision-damaged vehicle such as Mr. Keen's loses measurable trade-in value as soon as the car's collision history is discovered. If the damage is only cosmetic, then dealers and consumers alike are more willing to overlook the history and still consider purchasing the vehicle. If the damages include any safety or structural elements, then most consumers advise they would not consider purchasing the vehicle even if the repairs were guaranteed. Appraisers measure the degree of damage (damage severity) to a vehicle involved in a crash using what is called a "damage severity factor / modifier scale" that rates the probability of future performance problems based on the extent of repaired damages to a vehicle. On a scale of 0.00 to 1.00, a factor of 0.00 reflects only minor cosmetic damage that can be fixed without the need to replace or repaint any panel AND does not require the removal and re-installation of any safety, electrical or structural component. A factor of 1.00 reflects extensive cosmetic AND severe structural damage. Normally this type of damage will result in the vehicle being deemed a total loss, unless the vehicle has a very high market value.

21.     Mr. Keen's Corvette was not deemed to be a total loss following the second accident. After reviewing the required repairs, I assigned it a factor of 1.0 on the damage/severity factor modifier scale. . . .

22.     Included in my calculation of the dollar amount of diminished value to Mr. Keen's Corvette is what is called the "default luxury modifier." . . . .

Petty opined that, based on the data he collected and analyzed with respect to the instant collision, Keen's Corvette had a "Pre-Loss Market Value" of $38,037.00, a "Post-Repair Market Value" of $26,625.90, and a "Residual Inherent Diminished Value" of $11,411.10.

6

In his appraisal report, Petty noted that he does not disclose his underlying data, except as "part of an agreed settlement which will forego litigation." Rather, he generally explained the basis of his valuation as follows:

> During our research, we contacted multiple dealerships that specialize in the sale of the above mentioned vehicle make, and we researched potential purchaser's attitudes through phone surveys, web-based surveys, email surveys, and historical sales and purchase records. The research consists of discussing and identifying the subject vehicle and how the disclosure of damage history and repair will affect the value of the vehicle as a trade-in vehicle and/or a private party purchase vehicle in the opinion of used and new vehicle sales associates and/or managers, and private individuals who either own or are looking to purchase a vehicle such as the subject vehicle. Additionally, if actual sales documentation was available, then that data was also utilized. When evaluating dealer opinions, the element of dealer retail profit also had to be addressed and estimated so that our final findings remained credible. Because many dealers refuse to purchase previously damaged and repaired vehicles, there is sometimes a lack of actual sales records on the trade-in market, so in conformity with the USPAP, when this occurs, we create a hypothetical scenario based on the subject vehicle to allow for a credible measurement of the market. Our research and data on the subject vehicle indicates the following:
>
> The average loss of trade-in value due to severe collision history = $11,411.10

Petty attached valuation estimates from NADA, Kelley Blue Book, and iSeeCars.com.

In her summary-judgment response, Bark argued that Keen was not entitled to summary judgment because he did not establish his alleged damages as a matter of law. She asserted that Petty's affidavit simply states an opinion. And, Petty based his opinion on prospective buyers' perceptions, which are inherently subjective and

7

cannot be precisely calculated. She asserts that unliquidated damages, as here, must be decided by a trier of fact rather than by summary judgment. She did not attach evidence.

The trial court, without specifying its grounds, granted Keen summary judgment on his negligence claim against Bark. In its final judgment, the trial court awarded Keen damages in the amount of $11,411.10.

## Summary Judgment

In her sole issue, Bark argues that the trial court erred in granting Keen's motion for summary judgment because Keen failed to establish his diminution-in-value damages as a matter of law. *See* TEX. R. CIV. P. 166a(c). She asserts that the opinion testimony on which Keen relied is not conclusive.

## A.    Standard of Review

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). We take as true all evidence favorable to the non-movant and indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Id.* If a trial court grants summary judgment without specifying the ground, we must uphold the trial court's judgment if any of the grounds asserted is meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

8

In a traditional summary-judgment, the movant has the burden to show that no genuine issue of material fact exists and thus he is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). When a plaintiff moves for summary judgment on his own claim, he must conclusively prove all essential elements of his cause of action. *Rhône–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999). A plaintiff seeking a summary judgment awarding him damages on his claim must conclusively establish his damages. *McRay v. Dow Golub Remels & Beverly, LLP*, 554 S.W.3d 702, 705 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527, 540 (Tex. App.—Houston [14th Dist.] 2013, no pet.). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

Only after the movant meets his burden does the burden shift to the non-movant to present evidence to raise a genuine issue of material fact precluding summary judgment. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995); *see also McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342 (Tex. 1993) ("[S]ummary judgments must stand or fall on their own merits, and the non-movant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right.").

**B.    Analysis**

Here, Keen argued in his motion for summary judgment that he was entitled to judgment because he conclusively established his diminution-in-value damages through the opinion testimony of his expert, Petty.

### *Expert Opinion Testimony*

"It has long been the rule of this State that opinion testimony does not establish any material fact as a matter of law." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). Rather, it is within the province of the factfinder to weigh opinion evidence. *City of Keller*, 168 S.W.3d at 819. A factfinder may choose to believe or disbelieve all, or any part, of a witness's testimony. *Id.* And, it is the factfinder's role to resolve any conflicts and inconsistencies in the testimony. *Id*. at 820. A factfinder is afforded considerable discretion in evaluating opinion testimony on the issue of damages. *McGalliard*, 722 S.W.2d at 697.

Even an expert's opinion testimony is generally not conclusive because it nevertheless constitutes opinion testimony. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 339 (Tex. 1998). Expert witness testimony, even when uncontroverted, is not binding on a factfinder, *unless the subject matter is one for experts or skilled witnesses alone*. *McGalliard*, 722 S.W.2d at 697; *see also Sw. Tex. Coors, Inc. v. Morales*, 948 S.W.2d 948, 952 (Tex. App.—San Antonio 1997, no writ) ("Expert testimony on damages is only evidentiary and not binding upon

the trier of fact."). If, however, a factfinder is not free to reach a decision contrary to the evidence, then uncontroverted issues need not be submitted to a factfinder at all. *City of Keller*, 168 S.W.3d at 814–15. Accordingly, the Texas Rules of Civil Procedure provide that a summary judgment "may be based on uncontroverted testimonial evidence of . . . an expert witness *as to subject matter concerning which the trier of fact must be guided solely by the opinion testimony of experts*, if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." TEX. R. CIV. P. 166a(c) (emphasis added).

Whether a certain subject matter is one solely for experts is a question of law. *See FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 89 (Tex. 2004). A subject matter is for experts alone if factfinders "cannot properly be assumed to have or be able to form correct opinions of their own based upon evidence as a whole and aided by their own experience and knowledge of the subject of inquiry." *McGalliard*, 722 S.W.2d at 697. If the subject matter is not one solely for experts, i.e., factfinders are capable of forming their own opinions based on the record as a whole, then expert testimony, although uncontroverted, is not conclusive. *Martinez*, 977 S.W.2d at 339.

Here, the subject matter at issue is the diminution in market value of an automobile after a collision and repairs.

11

Generally, the standard for measuring damage to personal property is the difference in its market value immediately before and immediately after the injury, at the place where the damage occurred. *Thomas v. Oldham*, 895 S.W.2d 352, 359 (Tex. 1995). "Market value is what a willing buyer under no compulsion to buy will pay to a willing seller under no compulsion to sell." *Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 831 (Tex. 2014) (internal quotations omitted). In valuing property, "Texas courts have long held it appropriate" that a factfinder consider all the factors that a reasonable buyer and seller would consider in their negotiations. *State v. McCarley*, 247 S.W.3d 323, 325 (Tex. App.—Austin 2007, pet. denied).

The Texas Supreme Court has noted that a "repaired vehicle may command a smaller sum in the market than a like vehicle that has never been damaged, and that awarding [the owner] diminished value in addition to repair would go further to make him whole." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003). Such diminution-in-value, or "stigma damages," represent the market's perception of a decrease in value caused by the property having a history of injury. *Hous. Unlimited*, 443 S.W.3d at 824. "[A]n aggrieved consumer may be able to plead, prove and obtain favorable jury findings establishing both costs to repair and permanent reduction in market value notwithstanding such repairs, as a cumulative, rather than mutually exclusive, measures of damage." *Id.* at 826 (quoting *Ludt v.*

12

*McCollum*, 762 S.W.2d 575, 576 (Tex. 1988)); *see also Noteboom v. Farmers Tex. Cty. Mut. Ins. Co.*, 406 S.W.3d 381, 385 (Tex. App.—Fort Worth 2013, no pet.) (recognizing claimant's right to recover both cost to repair car and diminution of value remaining after repairs). "Diminution in value does not duplicate the cost of repairs if the diminution is based on a comparison of the original value of the property and the value after repairs are made." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 441 (Tex. 1995).

The supreme court and this Court have upheld diminution-in-value damages as applied to personal property. *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 227–28 (Tex. 2019) (upholding damages for diminution in value of repaired aircraft); *Brevelle v. Allen*, No. 01-17-00826-CV, 2018 WL 3150874, at *3 (Tex. App.—Houston [1st Dist.] June 28, 2018, no pet.) (mem. op.) (upholding damages for diminution in value of repaired automobile).

However, this Court and others have held that the subject matter of diminution-in-value of an automobile is not one in which a trier of fact must be guided *solely* by the opinion testimony of experts. *See Brevelle*, 2018 WL 3150874, at *3; *Culwell v. Diaz*, No. 05-12-00093-CV, 2013 WL 2609995, at *3 (Tex. App.—Dallas June 7, 2013, no pet.) (mem. op.) (holding that "determining the value of a car for purposes of calculating diminution of value is not so complicated that an expert's testimony is necessary for a jury to understand").

13

In *Brevelle*, this Court, also considering an alleged diminution in value pertaining to a 2014 Chevrolet Corvette Stingray after collision and repairs, held that the factfinder was not bound by the expert witnesses' damages figures and was "free to determine a different damages amount, based on the evidence presented *and its own knowledge and experience*." 2018 WL 3150874, at *3 (emphasis added). There, a vehicle driven by Allen collided with Brevelle's Corvette, and Allen stipulated to liability. *Id.* at *1. After the Corvette was repaired at a dealership, Brevelle brought a claim against Allen for the diminution in value of the Corvette after repairs. *Id.* At trial, Brevelle testified that a dealer told him that he would "take about a $10,000 hit" on trade-in value if he traded the Corvette to a dealer. *Id.* Brevelle presented, and the trial court admitted, an appraisal report stating that the Corvette had an actual cash value just before the collision of $60,000, and that, after the collision and repairs, the Corvette suffered a diminution in value of $9,556. *Id.*

Defendant Allen's expert, Stillwell, physically inspected Brevelle's Corvette. *Id.* He testified that the car sustained a "moderate" level of damage in the collision. *Id.* A fender, fender apron, front bumper, grill, and hood were damaged, but the frame was not. *Id.* The trial court admitted photographs into evidence. *Id.* at *2. Stillwell testified that an average purchaser would consider damage to cosmetics and structural reinforcement parts, as there, to be less significant than frame damage and would assign a lower loss-in-value. *Id.* at *1. Using his damage-assessment-

14

calculation form, which the trial court also admitted into evidence, Stillwell estimated that the diminution in the value of the Corvette as a result of the collision, and after repairs, was $2,168.46. *Id.* at \*2. He cautioned that his was not an exact appraisal, but an "estimate opinion." *Id.* He opined that it was possible that a buyer might reduce the value by a smaller or larger amount. *Id.* Notably, Stillwell testified that one could not identify with certainty the Corvette's diminution in value because it was dependent on the buyer's and seller's willingness to complete a sales transaction at a given point in time. *Id.*

After the jury found zero damages, the trial court entered a take-nothing judgment against Brevelle. *Id.* On appeal, this Court noted that the jury was "not bound by the witnesses' damages figures and was free to determine a different amount, based on the evidence presented and its own knowledge and experience." *Id.* at \*3. We concluded that the subject matter, that of "[d]iminution in value of a vehicle after it has been in a wreck but has been repaired," was not one for experts alone. *Id.* The jury saw pictures of the vehicle before and after the collision and heard evidence that the damages, which did not compromise the vehicle's frame and thus were considered less consequential, had been repaired. *Id.* We concluded that the jury reasonably could have applied its common knowledge and experience to evaluate the loss in value based on the evidence presented. *Id.*

15

Similarly, here, we conclude that that the subject matter, that of "[d]iminution in value of a vehicle after it has been in a wreck but has been repaired," is not one in which a trier of fact must be guided *solely* by the opinion testimony of experts. *See id*. Again, in valuing property, "Texas courts have long held it appropriate" that a factfinder consider all the factors that a reasonable buyer and seller would consider in their negotiations. *McCarley*, 247 S.W.3d at 325. Determining the market value of an automobile for purposes of calculating a diminution in its value is not so complicated that factfinders "cannot properly be assumed to have or be able to form correct opinions of their own based upon evidence as a whole and aided by their own experience and knowledge." *See McGalliard*, 722 S.W.2d at 697; *Brevelle*, 2018 WL 3150874, at *3; *Culwell*, 2013 WL 2609995, at *3.

Further, here, Petty testified in his affidavit that, in evaluating whether the market value of Keen's Corvette was diminished following the second collision, his objective was to determine the "Inherent Diminished Value," which he defined as:

> the difference in selling price, in a specific market, of a damaged vehicle that has been repaired and restored to industry standard as compared to a similar vehicle that has never been damaged. This Inherent Diminished Value is the result of *a prospective buyer's perception* that a vehicle with an accident history is not as valuable as another vehicle of the same year, make, model, condition and mileage, which has never been damaged.

(Emphasis added.)

16

Petty stated that he calculates diminished value by subtracting the vehicle's value after repairs from its value prior to the collision. Factors in his determination include the year, make, model, mileage, and condition of the vehicle, the location and severity of the damage, the quality of the repairs, and the "consumer belief" that vehicles that have been involved in a collision are more likely to present future problems. He reviews the repair facility's estimate and photographs of the car. He does not personally inspect the car before or after repairs.

Further, Petty explained the sources of his valuation as follows:

During our research, we contacted multiple dealerships that specialize in the sale of the above mentioned vehicle make, *and we researched potential purchaser's attitudes through phone surveys, web-based surveys, email surveys*, and historical sales and purchase records. *The research consists of discussing and identifying the subject vehicle and how the disclosure of damage history and repair will affect the value of the vehicle* as a trade-in vehicle and/*or a private party purchase* vehicle *in the opinion of* used and new vehicle sales associates and/or managers, and *private individuals who either own or are looking to purchase a vehicle such as the subject vehicle. . . .*[1]

---

1     We note that, to the extent that Petty opines regarding the "trade-in" value of Keen's Corvette, testimony regarding trade-in value is generally not probative of a car's fair market value. *See Scott v. State*, 741 S.W.2d 435, 437, 439 (Tex. Crim. App. 1987). That is,

"fair market value" and "trade-in value" are patently not the same. "Trade-in value" usually amounts only to intrinsic value, not to the owner, but to the person who pays the owner for his trade-in, which figure as we all have learned in our lifetimes when we traded in a vehicle may actually be far above or below actual fair market value, i.e., the price that is agreed upon for the vehicle that is going to replace the trade-in vehicle usually governs the price that will be paid for the trade-in vehicle. It may far exceed the actual fair market value or it may actually be well below the actual fair market value; it just

17

(Emphasis added.)

Thus, Petty's stated objective is to present an opinion estimating the *perception of a future buyer or consumer.* Petty states that he arrived at his estimate of the loss in value of Keen's Corvette by polling, through phone, email, and web-based surveys, *consumers* who either owned a similar car or who simply might consider such a purchase. In his polling, Petty disclosed the damage to Keen's Corvette and discussed the repairs made in order to determine "how the disclosure of damage history and repair will affect the value of the vehicle" to the consumer. Thus, factfinders, like the consumers Petty polled, could properly form correct opinions of their own based upon the evidence as a whole and aided by their own experience and knowledge. *See Brevelle*, 2018 WL 3150874, at *3; *see also Culwell*, 2013 WL 2609995, at *3.

In support of his argument that diminished value is a subject matter concerning which the trier of fact must be guided solely by the opinion testimony of experts, Keen relies on *Natural Gas Pipeline Co. of America v. Justiss*, 397 S.W.3d

---

depends on how good a "horse trader" the owner of the trade-in vehicle might be.

*Id.* at 439 (Teague, J., concurring and dissenting); *see also Heckman v. Williamson Cty.*, 369 S.W.3d 137, 146 (Tex. 2012) ("More than a century ago, this Court noted that there are criminal cases which may incidentally involve a question of civil law, and civil cases in which in like manner points of criminal law call for solution."); *Benson v. Chalk*, 536 S.W.3d 886, 896–97 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (applying *Heckman*). We need not resolve this issue, however, because Petty's valuation is otherwise not conclusive for the reasons discussed above.

18

150, 157, 159 (Tex. 2012), *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 851–52 (Tex. 2011), and *Harris Cty. Appraisal Dist. v. Riverway Holdings, L.P.*, No. 14-09-00786-CV, 2011 WL 529466, at *5 (Tex. App.—Houston [14th Dist.] Feb. 15, 2011, pet. denied) (mem. op.). He asserts that this Court should overturn its opinion in *Brevelle* because it conflicts with the Texas Supreme Court's opinion in *Justiss*.

*Justiss* and *Reid*, which concern the valuation of real property, state that an expert's opinion may establish market value and that a witness testifying as an expert must be so designated. *Justiss*, 397 S.W.3d at 156–57, 159; *see also Reid Rd.*, 337 S.W.3d at 851–52 (holding that "a witness who will be giving opinion evidence about a property's fair market value must be disclosed and designated as an expert pursuant to discovery and other applicable rules"). Nothing in *Justiss* or *Reid*, however, states that factfinders *must be guided solely by*, and are thus bound by, an expert's opinion as to valuation. Thus, *Brevelle* is not in conflict with *Justiss*, as Keen asserts.

Further, Keen relies on *Riverway Holdings*, in which a sister court considered whether the subject matter before it was as such "that a trier of fact *would be* guided solely by" expert opinion, and it determined that the valuation dispute before it constituted subject matter on which "the trier of fact *is guided by* the opinion testimony of experts under Rule 166a(c)." 2011 WL 529466, at *4–5 (emphasis

19

added).  However, this is not the standard.  Rule 166a(c) states, rather, that a summary judgment may be based on uncontroverted testimonial evidence of an expert witness as to subject matter concerning which "the trier of fact ***must be guided solely by*** the opinion testimony of experts."  *See* TEX. R. CIV. P. 166a(c) (emphasis added).

We conclude that the subject matter of the diminution in value of Keen's Corvette is not one for experts *alone* because factfinders could properly be assumed to have, or be able to form, correct opinions of their own based upon the evidence as a whole and aided by their own experience and knowledge.  *See McGalliard*, 722 S.W.2d at 697.  Because factfinders are capable of forming their own opinions based on the record as a whole and the subject matter is not one in which a trier of fact *must be guided solely by* the opinion testimony of experts, Petty's expert opinion testimony, although uncontroverted, is not conclusive.  *See Martinez*, 977 S.W.2d at 339.  Because Keen's evidence is not conclusive, we hold that he did not meet his initial burden to establish his right to judgment as a matter of law.  *See Rhône–Poulenc, Inc.*, 997 S.W.2d at 223.  Because Keen did not meet his initial burden, the burden never shifted to Bark to present evidence creating an issue of material fact.  *See Siegler*, 899 S.W.2d at 197.

Accordingly, we hold that the trial court erred in granting summary judgment for Keen on his claim for diminution-in-value damages.

We sustain Bark's sole issue.

## Conclusion

We reverse the trial court's judgment and remand for further proceedings.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Hightower and Adams.